# United States Court of Appeals

Eleventh Circuit

56 Forsyth Street, N.W.

Atlanta, Georgia 30303

**John Ley**
Clerk of the Court

For rules and forms visit
www.ca11.uscourts.gov

April 02, 2010

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI FL 33128-1813

FILED by _____ D.C.

APR 0 6 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**Appeal Number: 09-11446-CC**
Case Style: USA v. Franklin Duran
District Court Number:  07-20999 CR-JAL

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
    Original Exhibits, consisting of: One Sealed Envelope and One psi
    Original record on appeal or review, consisting of: Seventy-Three Volumes

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, <u>but not a copy of the court's decision</u>, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

John Ley, Clerk of Court

Reply To: Will Miller (404) 335-6194

Encl.

MDT-1 (06/2006)

# United States Court of Appeals
## For the Eleventh Circuit

No. 09-11446

District Court Docket No.
07-20999-CR-JAL

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Feb 16, 2010

JOHN LEY
CLERK

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

versus

FRANKLIN DURAN,

        Defendant-Appellant.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By_____
Deputy Clerk
Atlanta, Georgia

-----------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
-----------------------------------------------------------------

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:    February 16, 2010
For the Court:    John Ley, Clerk
By:    Clark, Djuanna



ISSUED AS MANDATE
APR 0 2 2010
U.S. COURT OF APPEALS
ATLANTA GA

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 16, 2010
JOHN LEY
CLERK

No. 09-11446

D. C. Docket No. 07-20999-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANKLIN DURAN,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Florida

(February 16, 2010)

Before WILSON and ANDERSON, Circuit Judges, and RESTANI,* Judge.

---

*Honorable Jane A. Restani, Chief Judge, United States Court of International Trade,
sitting by designation.

WILSON, Circuit Judge:

Franklin Duran ("Duran"), a Venezuelan citizen, was convicted of conspiring with one of his business partners and three other co-conspirators to knowingly act in the United States as an agent of a foreign government, without prior notification to the Attorney General of the United States, in violation of 18 U.S.C. § 371, and of acting in the United States as an agent of a foreign government, without prior notification to the Attorney General, in violation of 18 U.S.C. § 951, as a result of his involvement in attempting to cover up the so-called "Suitcase Scandal" between Venezuela and Argentina. Duran's business partner and the two other co-conspirators pled guilty to the same charges and testified against Duran at his trial. Duran now raises five issues on appeal: (1) that § 951 is unconstitutionally vague as applied to the facts of this case; (2) that Federal Rule of Evidence 404(b) character evidence was admitted for an improper purpose; (3) that the Government engaged in prosecutorial misconduct by improperly commenting on the Rule 404(b) evidence; (4) that evidence of Duran and his co-conspirators' lack of knowledge of the notification requirement under § 951 was erroneously excluded; and (5) that the district court should have admitted several hearsay statements evidencing Duran's lack of intent to act as an agent of a foreign government under § 951. Upon considering the briefs, the record, and after the

2

benefit of oral argument, we affirm Duran's convictions under 18 U.S.C. §§ 371 and 951.

## I. BACKGROUND

Duran was a co-proprietor of Venoco, the largest private petro-chemical enterprise in Venezuela, which is reliant upon the operations of Petróleos de Venezuela, S.A. ("PDVSA"), an energy corporation and monopoly owned and operated by the Venezuelan government. Several of Duran's other ventures were also heavily dependent upon the favor of the Venezuelan government. Carlos Kauffmann ("Kauffmann") was one of Duran's co-conspirators and Duran's main business partner, as the other co-proprietor of Venoco. Prominent among Duran's business partners was Guido Alejandro Antonini Wilson ("Antonini"), a dual citizen of Venezuela and the United States, who engaged in commercial dealings with the Venezuelan government and other ventures involving Venezuelan co-investors. In addition to being business partners, Duran, Kauffmann, and Antonini were personal friends.

The "Suitcase Scandal" between Argentina and Venezuela erupted on August 4, 2007, when Argentine customs agents searched a suitcase Antonini was carrying upon arrival in Buenos Aires, Argentina on a private plane chartered by the PDVSA. A customs agent discovered approximately $800,000 in United States

currency in the suitcase. It is a criminal violation in Argentina to fail to declare more than $10,000 being imported into the country. Antonini, traveling on his Venezuelan passport, executed a customs statement in which he listed Duran's Caracas, Venezuela apartment as his residence. Thereafter, Antonini attended a reception for Venezuelan President Hugo Chavez in Buenos Aires and boarded the first flight to Miami. As a result of Antonini leaving Argentina without resolving the introduction of $800,000 into Argentina without declaring it, the Argentine authorities began extradition proceedings against Antonini. Communication among Antonini, Duran, and Kauffmann commenced immediately after Antonini returned to Miami because Duran and Venoco had been implicated when Antonini listed Duran's apartment on the customs statement. The media speculated that the discovery of the suitcase with $800,000 was evidence that the governments of Venezuela and Argentina had been secretly channeling large sums of money from PDVSA to Argentine presidential candidate Cristina Fernández de Kirchner, favored by the Venezuelan regime.

After being implicated in the "Suitcase Scandal," Duran contacted Tarek Al-Aissimi, Venezuela's Minister of the Interior, and General Henry Rangel Silva ("Rangel"), Director of the Venezuelan intelligence agency, Dirección de los Servicios de Inteligencia y Prevención (the "DISIP"). They informed Duran that

4

the DISIP would be handling the "Suitcase Scandal." On August 10, 2007, Duran

and his brother, a DISIP agent, traveled to Miami to get Antonini to set forth a full

written account of the incident with the suitcase. Antonini gave the Durans a full

oral recounting, but he declined to provide the requested written narrative. Shortly

thereafter, Antonini hired an attorney and entered into a cooperation agreement

with the FBI. In Venezuela, the DISIP formulated a strategy to defuse the

"Suitcase Scandal" in hopes of concealing evidence that the $800,000 found in the

suitcase was a campaign contribution from the Venezuelan government to the

Argentine presidential candidate. The DISIP proposed that a forged and back-

dated document purporting to attest to Antonini's removal of $800,000 of his own

money from Venezuela be placed in the files of Venezuela's customs authority.

Then, the DISIP would retain an Argentine lawyer, pursuant to Antonini's

execution of a power of attorney, to represent Antonini for failing to declare the

money upon arrival in Argentina. Thus, if Antonini were to claim the money as his

own, the matter would be resolved between Venezuela and Argentina without any

implication that the money was being funneled to the Argentine presidential

candidate.

In order to secure Antonini's cooperation, the DISIP retained a Venezuelan

attorney, Moises Maionica ("Maionica"), one of the co-conspirators who pled

5

guilty and testified against Duran, believing that he could address Antonini's legal concerns and prepare and oversee the execution of a power of attorney.[1] The DISIP also enlisted the help of Duran and Kauffmann because of their personal relationship and potential influence over Antonini. Duran, Kauffmann, and Maionica met with Antonini several times in Miami to discuss the DISIP's strategy and to convince Antonini to cooperate. Antonini wore a recording device provided by the FBI to all of the meetings. Duran repeatedly tried to get Antonini to sign a power of attorney. D.E. 318 at 80. Duran, Kauffmann, and Maionica assured Antonini that the Venezuelan and Argentine governments would come to an agreement, and Argentina would drop the charges against Antonini once he executed the power of attorney. Antonini raised some concerns with the proposal and remained non-committal.

After several unsuccessful attempts to get Antonini to sign the power of attorney, Duran, Kauffmann, and Maionica met with Rangel at the DISIP headquarters in Caracas, Venezuela. Duran told Rangel that he would seek to get Antonini to sign the power of attorney. *Id.* In September 2007, Duran met with Antonini and encouraged him to sign the power of attorney, but Antonini refused. Frustrated with Antonini's non-cooperation, Duran did not meet with Antonini

---

[1]Maionica was retained and compensated by the DISIP. He acknowledged that, at all times, he acted as an agent of the Venezuelan government.

again until December 2007.  In early October 2007, Antonini sent a written offer to

President Hugo Chavez, requesting $2 million in monetary compensation and

DISIP assistance in forging sufficient documentation to corroborate his ownership

of the $800,000 seized by Argentine officials.  On October 28, Antonini met with

DISIP agent Antonio Jose Canchica Gomez ("Gomez") in a recorded meeting and

reiterated the demands he made to Chavez.  Gomez accepted the offer on behalf of

Chavez.  After Rangel confirmed the terms with Antonini via telephone, the only

remaining question was how the $2 million would be transferred.  At a meeting on

December 11, 2007, Duran supplied Antonini with the falsified documents that

would justify Antonini bringing $800,000 into Argentina.  They also discussed the

power of attorney and the payment of the $2 million.  As Duran and Maionica left

the meeting, the FBI arrested them.

Before trial, the Government filed several motions *in limine* relevant to this

appeal.  First, the Government sought to preclude the presentation of evidence

regarding the foreign policy or lack of foreign policy between the United States

and Venezuela.  The Government was concerned that Duran would introduce such

evidence to show that Duran was the subject of a political prosecution designed to

embarrass the Venezuelan government for illegally contributing to an Argentine

presidential candidate.  The Government argued that relations between the United

States and Venezuela had nothing to do with Duran's specific criminal conduct or the statutes he violated. Additionally, the Government argued that permitting Duran to raise the defense of being politically prosecuted would be an invitation for improper jury nullification. Duran responded that the evidence of foreign policy relations between the United States and Venezuela was directly relevant to the motives of the Government witnesses, and that the only purpose of the prosecution was to embarrass the Chavez government in Venezuela by using Duran as a scapegoat. However, at the status conference, Duran admitted that he would not defend the case on the basis that it was a political prosecution, even though he said it was. D.E. 216 at 40. Thus, the district court granted the Government's motion *in limine* to exclude evidence of foreign policy relations between the United States and Venezuela because it was facially irrelevant to the crimes charged.

Second, the Government sought to preclude Duran from introducing evidence about, or making argument regarding, Duran's assertion that he did not know about the duty to notify the Attorney General that he would be acting as a foreign agent on the grounds that such evidence or argument was irrelevant and confusing to the jury. Duran responded that knowledge of the notification requirement is relevant to the jury's determination of whether Duran acted with

8

knowledge that his conduct was unlawful for purposes of establishing his participation in the charged conspiracy and whether he acted under the direction and control of a foreign government. The district court granted the Government's motion *in limine* excluding evidence of *mens rea* of Duran's failure to notify the Attorney General of his conduct as a foreign agent because § 951 is a general intent crime that does not require proof that a defendant knew of the notification requirement. However, the district court did not preclude the introduction of *mens rea* evidence as to the element of knowingly acting as an agent of a foreign government.

The Government also filed a motion *in limine* seeking to introduce evidence pursuant to Federal Rule of Evidence 404(b) of Duran and Kauffmann's numerous schemes of giving "kickbacks" to officials of various agencies of the Venezuelan government, as well as to officials of various states of Venezuela. The Government argued that such evidence was admissible under Rule 404(b) because it was relevant to issues other than Duran's character, including whether Duran knowingly conspired with Kauffmann and others to act as agents of the Venezuelan government; whether Duran knowingly acted as an agent of the Venezuelan government; and whether there was a preexisting relationship between Duran and the Venezuelan government. In response, Duran argued that the alleged

9

kickback schemes were irrelevant because none of the kickback schemes involved the DISIP or any official with an identified connection to the DISIP. The district court initially denied the Government's request to introduce evidence of Duran's kickbacks and only permitted Kauffmann to testify generally in its case-in-chief that he and Duran gave kickbacks to Venezuelan government officials.

Mid-trial, however, the district court permitted Duran to raise the defense of entrapment. Duran initially advanced the theory that he acted wholly independent of the Venezuelan government based upon concern for his own affairs. Duran revised this initial defense to posit that, while he initially acted on his own, he became "entrapped" into acting as Venezuela's agent by Antonini's insistence that the aid he sought be provided by the Venezuelan government. Upon request by the Government, the district court permitted the introduction of Duran's kickbacks through Kauffmann's rebuttal testimony under Rule 404(b) because the evidence was directly relevant to show Duran's predisposition to act as an agent of the Venezuelan government, and thus was admissible to negate Duran's entrapment defense.

At trial, the prosecution presented its case through the testimonies of Antonini, Maionica, and Kauffmann, as amplified by the FBI's recorded conversations. A jury convicted Duran of violating 18 U.S.C. §§ 371 and 951, and

10

the district court sentenced him to 48 months' imprisonment followed by a term of three years' supervised release.

## II. DISCUSSION

### A.    18 U.S.C. § 951 Is Not Unconstitutionally Vague

We review whether a statute is unconstitutionally vague *de novo. United States v. Paradies*, 98 F.3d 1266, 1282 (11th Cir. 1996) (citing *Dodger's Bar & Grill, Inc. v. Johnson County Bd. of County Comm'rs*, 32 F.3d 1436, 1443 (10th Cir. 1994)).  Duran argues that § 951 is unconstitutionally vague as applied to the facts of this case.  Specifically, he contends that he did not have notice, and could not have had notice, of his obligation to notify the Attorney General of his purportedly legal conduct in the United States on behalf of the Venezuelan government, presumably because he was not an employee of or spy for the Venezuelan government.  The jury found, however, that he was an agent of a foreign government.  Section 951(a) provides that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General" is guilty of a crime.  Section 951's corresponding regulations set forth further guidance on compliance with the statute. *See* 28 C.F.R. § 73.1 *et seq.*

Void for vagueness "means that criminal responsibility should not attach

11

where one could not reasonably understand that his contemplated conduct is proscribed." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32–33 (1963) (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954)). If a vagueness challenge to a statute does not involve the First Amendment, the analysis must be as applied to the facts of the case. *United States v. Mazurie*, 419 U.S. 544, 550 (1975) (citing *Nat'l Dairy Prods. Corp.*, 372 U.S. at 32); *United States v. Awan*, 966 F.2d 1415, 1424 (11th Cir. 1992) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)). We apply the two-part standard set forth in *Kolender v. Lawson*, 461 U.S. 352 (1983), when we evaluate a vagueness challenge; it "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Awan*, 966 F.2d at 1424 (quoting *Kolender*, 461 U.S. at 357 (internal quotation marks omitted)). "[S]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language," and there is a strong presumption supporting the constitutionality of legislation. *Nat'l Dairy Prods. Corp.*, 372 U.S. at 32.

Additionally, as the Supreme Court in *Cheek v. United States* stated, "[t]he general rule that ignorance of the law or a mistake of law is no defense to criminal

12

prosecution is deeply rooted in the American legal system." 498 U.S. 192, 199
(1991). Because this rule is based on the common law notion that presumes that
every person knows the law, and the law is definite, the Supreme Court has applied
it to cases construing criminal statutes. *Id.*

## 1.    The Plain Language of § 951 is Readily Understandable

In analyzing a vagueness claim, the first step in determining whether a
statute provides fair warning is to begin with the language of the statute itself.
*United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008). Where the language
alone sets forth plainly perceived boundaries, no further inquiry is necessary. *Id.* at
744. To violate § 951, (1) a person must act; (2) the action must be taken at the
direction of or under the control of a foreign government; and (3) the person must
fail to notify the Attorney General before taking such action. *See* 18 U.S.C. §
951(a) (criminalizing "acts" of "an agent of a foreign government without prior
notification to the Attorney General"); 18 U.S.C. § 951(d) (defining "agent of a
foreign government" as "an individual who agrees to operate within the United
States subject to the direction or control of a foreign government or official"); 28
C.F.R. § 73.1(a) (defining "agent" as "all individuals acting as representatives of,
or on behalf of, a foreign government or official, who are subject to the direction
and control of that foreign government or official"); 28 C.F.R. § 73.3 (detailing the

procedure and means of giving notification to the Attorney General).   Nothing in §
951 is, in the context before us, vague.  Here, § 951 plainly and concretely
identifies the conduct which constitutes its violation, and the statute's language is
clear and unambiguous. *See United States v. Latchin*, 554 F.3d 709, 715 (7th Cir.
2009) (finding that "[i]t was enough for the jury to conclude that Latchin took acts
of *some kind* on behalf of Iraq without first registering as a foreign agent"
(emphasis in original)); *see also United States v. Truong Dinh Hung*, 629 F.2d 908,
920 (4th Cir. 1980) (finding the term "agent" to be clear on the face of the statute);
*United States v. Lindauer*, S.D.N.Y. 2004, ___ F. Supp. 2d ___, at *4 (No. S2 03
CR. 807 (MBM), Dec. 6, 2004) (same).  Therefore, the plain language of § 951 and
its corresponding regulations give notice of what is prohibited and are readily
understandable to a person of ordinary intelligence.

### 2.    Section 951 Is a General Intent Crime

Looking beyond the statutory language, Duran argues that § 951 is
unconstitutionally vague because it must require an element of specific intent that a
defendant knew of the duty to notify the Attorney General of conduct that
necessarily involves espionage or subversive activity as an agent of a foreign
government.  Specifically, Duran argues that he could not have had notice of the
notification requirement without the specific intent to fail to notify the Attorney

14

General or the specific intent to engage in espionage or subversive activity, which would have given him the probability of knowledge of the notification requirement. However, we have routinely validated general intent statutes against vagueness challenges without suggesting that the lack of a specific intent component heightens its need for definiteness or otherwise renders the provision susceptible to constitutional doubt. *See, e.g., United States v. Eckhardt*, 466 F.3d 938, 943–44 (11th Cir. 2006) (placing "'annoying, abusive, harassing, or threatening telephone calls' in violation of 47 U.S.C. § 223(a)(1)(C)" is not vague despite absence of specific intent element); *United States v. Hedges*, 912 F.2d 1397, 1403 (11th Cir. 1990) (finding strict liability offense requiring no scienter was not vague as judged by normal constitutional standard).

Section 951's plain language makes it clear that it is a general intent crime, as there is no *mens rea* element on the face of the statute. Additionally, in *United States v. Campa*, we affirmatively held that § 951 is a general intent crime, and knowledge of the notification requirement need not be proven by the Government. 529 F.3d 980, 999 (11th Cir. 2008). We joined the Seventh Circuit in *Dumeisi*, holding that "section 951 does not require proof that the defendant knew of the requirement to register." *Id.* The silence of § 951 as to a specific intent element is dispositive of the fact that Congress intended it to be one of general intent. *Id.*

15

(citing *United States v. Ettinger*, 344 F.3d 1149, 1158 (11th Cir. 2003)). "[A] defendant need not intend to violate the law to commit a general intent crime, but he must actually intend to do the act that the law proscribes." *Id.* (alteration in original) (quoting *United States v. Phillips*, 19 F.3d 1565, 1576–77 (11th Cir. 1994)) (internal quotation marks omitted). Section 951 proscribes acting as an agent of a foreign government without first notifying the Attorney General, and a person of ordinary intelligence can understand what conduct the statute prohibits. Although we found that § 951 does not require a showing of a heightened *mens rea* requirement, the Government must still prove the *mens rea* of general intent. *Id.* In fact, the district court in *Campa* correctly instructed the jury "that the defendants must have acted 'knowingly,' and that they must have known 'that [they] had not provided prior notification to the Attorney General.'" *Id.* (alteration in original). What the statute prohibits is clear on its face, and ignorance of the law is no defense to a criminal prosecution. *See id.* Accordingly, the fact that § 951 requires only general intent merely subjects it to simple linguistic scrutiny.

### 3.    Section 951 Does Not Require Actual Notice or Knowledge of the Notification Requirement

Despite our precedent and the plain language of § 951, Duran argues that the statute must be read to require actual knowledge or probability of knowledge of the notification requirement by affirmatively engaging in espionage or subversive

16

activities. Duran argues that in order to avoid a vagueness challenge, we must read into § 951 an element of specific intent.

It is true that knowledge of a registration or notification statute is required in some cases; however, knowledge or probability of knowledge is not an element under § 951, and Duran is deemed to have notice because the statute requires the affirmative action and conduct of the defendant. Although § 951 appears to be a registration statute similar to the ordinance held unconstitutional in *Lambert v. California*, in which the defendant was convicted for violating a Los Angeles ordinance requiring all convicted felons who remain in Los Angeles for more than five days to register, whether a defendant must register under § 951 depends on the defendant's *action* and *conduct* as an agent of a foreign government. 355 U.S. 225, 226–27 (1957); *see Latchin*, 554 F.3d at 715. Whereas the registration statute in *Lambert* was held unconstitutional in part because it required the defendant merely to hold the status of felon, under § 951, it is not sufficient for the defendant to hold the status of an agent of a foreign government—he must also act. *See* 355 U.S. at 228 (finding the defendant's conduct "wholly passive"). Essentially, the *Lambert* Court distinguished between misfeasance and nonfeasance, and here, Duran engaged in misfeasance by "acting" as an agent of a foreign government without notifying the Attorney General before doing so.

Duran also cites *United States v. Mancuso*, a Second Circuit case in which the defendant was convicted under a statute that "requires any citizen convicted of narcotics or marijuana offenses, as well as those who are addicted to, or 'use' narcotics drugs, to register with customs officials on leaving and entering the country." 420 F.2d 556, 556 (2d Cir. 1970). The Second Circuit held that knowledge or probability of knowledge of the registration requirement is an element that must be established in order to be convicted under the statute because finding that the defendant's conduct was nonfeasance would render the statute unconstitutional, but requiring probability of knowledge of the registration requirement would save it. *Id.* at 557–58. Thus, the Second Circuit read into the statute the element of probability of knowledge, finding that the defendant did not have probability of knowledge of the registration requirement, and therefore, could not be convicted under the statute. *Id.* at 558. Duran similarly argues that the element of knowledge or probability of knowledge of the notification requirement cannot be separated from § 951. However, the *Mancuso* decision is only persuasive authority in this Circuit, and our Court already decided in *Campa* that knowledge of the registration requirement is not an element of § 951. Additionally, § 951 requires misfeasance, which was not required under the statute

18

at issue in *Mancuso*.[2] Thus, unlike the registration requirements in *Lambert* and *Mancuso*, which were based on the defendant's status as a convicted felon or narcotics violator, conviction under § 951 involves affirmative action or conduct on behalf of a foreign government, and Duran is deemed to have notice.

Duran argues that in order to have sufficient notice of the notification requirement, his conduct must also have necessarily involved an intent to engage in espionage or traditional notions of spying and subversive activity. He argues that his purportedly innocent conduct could not have given him the probability of knowledge of the registration requirement. Duran relies on the legislative history of § 951 and argues that all of the cases that involve criminal prosecution under § 951 relate to some form of subversive activity or espionage-related component. However, there is no suggestion in the language of the statute, the legislative history, or cases that convictions under § 951 require the conduct to be of that nature. To the contrary, the activities that fall within § 951's purview have never been expressly or by judicial interpretation limited to those bearing upon national security or even those which by their nature are criminal or inherently wrongful.

---

[2] While in some areas the distinction between nonfeasance and misfeasance may not be clear, this is not an issue for this case. Status is not the issue in any sense, rather specific actions are at issue. Further, if there were any such confusion, the area of foreign intelligence activities is one which is highly regulated and a notification or registration requirement normally would not be unexpected by one who acts as an intermediary for a foreign government.

19

*See Latchin*, 554 F.3d at 715 (uncertain acts of "*some kind*" were sufficient to establish guilt under § 951 (emphasis in original)); *Dumeisi*, 424 F.3d at 581 (transmitting publicly available information was sufficient).[3]  In fact, the Northern District of Illinois found that § 951 is not unconstitutional, even though it requires registration when *no* future criminal activity is anticipated.  *United States v. Melekh*, 193 F. Supp. 586, 592 (N.D. Ill. 1961).

Relying on legislative history, Duran asserts that his failure to have anticipated the statute's registration requirement stemmed from the fact that his conduct did not involve espionage or traditional spying on the United States government, what he categorizes as the primary focus of § 951.  "When the text of a statute is plain, however, we need not concern ourselves with contrary intent or purpose revealed by the legislative history."  *Hunt*, 526 F.3d at 744.  Duran contends that for over ninety years, the only application of § 951 has been to prosecute cases dealing with espionage or subversive activities against the United States.  However, the plain language of § 951 does not exclude from its scope cases that do not involve such subversive activities.  "Congress is free to pass laws with language covering areas well beyond the particular crisis *du jour* that initially

---

[3] Although these cases involved agents of a foreign government acting for espionage-related purposes and goals, the conduct for which the agents were convicted under § 951 did not involve illegal activity or traditional subversive conduct.

prompted legislative action." *Id.*

Although Congress' original intent in 1917 was national security, defense,

and targeting espionage and subversive acts,[4] over time, the original 1917 Act

broke off into three directions to form three separate registration or notification

statutes dealing with agents of foreign governments.  Congress enacted legislation

targeted specifically at such subversive acts through the Foreign Agents

Registration Act of 1938 ("FARA")[5] and 50 U.S.C. § 851,[6] and Congress separated

---

[4] The earliest form of § 951 was enacted on June 15, 1917, shortly after the United States entered World War I.  It was part of "An Act To punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes."  Act of June 15, 1917, ch. 30, 40 Stat. 217 (codified as amended at 18 U.S.C. § 951 (1948)).  In fact, the predecessor to § 951 is found in Title VIII, § 3 entitled: "Disturbance of foreign relations."  *Id.* at 226.  Legislative history suggests that the 1917 Act was a war-time act to protect the United States from subversive elements that could threaten America's war effort.  This is because, in its Congressional Reports, Congress labeled the act, "To Punish Espionage and Enforce the Criminal Laws of the United States," H.R. Rep. No. 65-30, at 1 (1917), and "Espionage Bill," H.R. Rep. No. 65-65, at 1 (1917) (Conf. Rep.); H.R. Rep. No. 65-69, at 1 (1917) (Conf. Rep.).

[5] FARA, 22 U.S.C. § 611 *et seq.*, is primarily aimed at foreign political propagandists and political activists that the United States has an interest in keeping track of, and it requires agents of foreign principals to identify themselves and their foreign principals, disclose their activities, and file and label political propaganda.  FARA's registration provision states in pertinent part, "No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement . . . unless he is exempt from registration."  22 U.S.C. § 612(a).  Thus, this is one example of a statutory registration requirement enacted after the 1917 Act that specifically covers "agents of foreign principals" as defined under 22 U.S.C. § 611(c).

[6] On August 1, 1956, Congress enacted 50 U.S.C. § 851 "Registration of certain persons; filing statement; regulations" under Title 50 "War and National Defense," Chapter 23 "Internal Security," Subchapter V "Registration of Certain Persons Trained in Foreign Espionage Systems."  Section 851 states in pertinent part that,

[E]very person who has knowledge of, or has received instruction or assignment

21

§ 951, classifying it under "Foreign Relations." The limited legislative history

persuasively suggests that Congress chose to separate § 951 and treat it as a catch-

all statute that would cover all conduct taken on behalf of a foreign government.[7]

Thus, Duran's argument that he could not have had notice of the registration

requirement under § 951 is meritless because registration is not only required of

spies or foreign agents engaged in subversive acts under FARA or § 851, but it

also reaches beyond such classifications to *any* affirmative conduct undertaken as

an agent of a foreign government.  Additionally, 28 C.F.R. § 73.6 states that "[t]he

filing of a notification under [§ 951] shall not be deemed compliance with the

requirements of the Foreign Agents Registration Act of 1938, as amended, 22

---

in, the espionage, counter-espionage, or sabotage service or tactics of a
government of a foreign country or of a foreign political party, shall register with
the Attorney General by filing with the Attorney General a registration statement
in duplicate, under oath, prepared and filed in a such manner and form, and
containing such statements, information, or documents pertinent to the purposes
and objectives of this subchapter as the Attorney General, having due regard for
the national security and the public interest, by regulations prescribes.

Thus, § 851 is an espionage registration statute, while § 951 is a broader, catch-all notification
statute aimed at all foreign relations in general.

[7] On March 28, 1940, the 1917 version of § 951 was amended and codified under Title 22
"Foreign Relations and Intercourse" Section 601 "Acting as a foreign governmental agent
without notice to Secretary of State." 22 U.S.C. § 601 was codified under the same subchapter
as FARA. Act of March 28, 1940, ch. 72, § 6, 54 Stat. 79, 80 (codified at 22 U.S.C. § 601).
Then, in 1948, 22 U.S.C. § 601 was repealed and re-codified under 18 U.S.C. § 951 "Agents of
foreign governments" under Chapter 45 "Foreign Relations." Thus, it became a completely
separate notification statute from FARA, and it continues to cover any action of conduct by an
agent of a foreign government.

U.S.C. § 611 et seq., nor compliance with any other statute."

The Government is vested with sound discretion in determining who to prosecute and under what laws to prosecute. Here, the Government exercised its prosecutorial discretion to convict Duran for violating § 951, which permits prosecution so long as Duran acted on behalf of a foreign government and failed to notify the Attorney General of such action, regardless of the nature of such action.[8]

The broad sweep of § 951 creates a plethora of possibilities under which those engaged in purportedly legal conduct on behalf of a foreign government could be convicted if an agent of a foreign government fails to notify the Attorney General of such conduct. Here, it is hard to imagine that Duran was acting completely innocently because his actions generally involved bribery and extortion, even if not violations of United States law. Section 951 sweeps broadly because the Government has an interest in knowing the identity of those acting on behalf of a foreign government within the United States, whether the action is legal or not. By its plain text, the statute placed Duran on notice that his conduct was unlawful.

Section 951 is not unconstitutionally vague as applied to Duran. The jury

---

[8] It is therefore understandable why the district court excluded evidence regarding the foreign policy between the United States and Venezuela because such evidence is irrelevant and has no relation to the elements of §§ 951 or 371 or to the exercise of the Government's prosecutorial discretion.

determined that Duran acted to convince Antonini to sign a power of attorney and delivered false documents to Antonini; that his action was on behalf of the Venezuelan government; and that Duran failed to notify the Attorney General of such action before acting. This Court has already determined that § 951 is a general intent crime, and Duran did not need to know of the notification requirement before acting. Section 951 covers any and all affirmative conduct taken on behalf of a foreign government, and is not limited to espionage or subversive activities. The case for upholding Duran's conviction under § 951 is particularly strong because the language is readily understandable by a person of ordinary intelligence, his conduct involved some form of bribery or extortion on behalf of the Venezuelan government, and Duran's conviction was not based on mere status as an agent of the Venezuelan government.[9]

**B.    Evidentiary Issues**

We review evidentiary rulings for an abuse of discretion. *Eckhardt*, 466 F.3d at 946 (citing *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005)).

**1.    Evidence of Knowledge of the Notification Requirement under § 951 Was Properly Excluded**

---

[9] Because Duran's conduct was not innocent, we need not in this case express an opinion as to the constitutionality of possible applications of § 951 to completely innocent conduct.

24

Duran argues that the district court abused its discretion in excluding evidence of *mens rea* to show that Duran and his co-conspirators did not know of the notification requirement under § 951. As discussed in § A *supra*, this Court in *Campa* held that a defendant need not know of the notification requirement under § 951 in order to be convicted. 529 F.3d at 999. "For a conviction of conspiracy, there must be proof of (1) an agreement between two or more persons, (2) an unlawful purpose, and (3) an overt act committed by one of the coconspirators in furtherance of the conspiracy." *United States v. Wieschenberg*, 604 F.2d 326, 331 (5th Cir. 1979).[10] "In addition, 'in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself.'" *Id.* (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975)). Thus, the Government had to prove that Duran knowingly acted as an agent of a foreign government without first notifying the Attorney General, and that his co-conspirators knew that he acted as such.

Duran argues that because conspiracy and aiding and abetting require willfulness, they import a higher *mens rea* into the substantive charge under § 951,

---

[10] In *Bonner v. City of Prichard*, this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

and thus, evidence of Duran's averred lack of knowledge of the registration requirement is relevant. Although conspiracy is a specific intent crime, and aiding and abetting of a substantive violation must be willfully undertaken, those theories of vicarious liability do not import into either the conspiracy charge or the substantive offense under § 951 that Duran be on actual notice of the registration requirement. *See Feola*, 420 U.S. at 686–87. *Feola* reiterates the longstanding and uniformly recognized rule that the conspiracy statute does not impose its scienter requirement upon the general intent offense that is the object of the conspiracy. *Id.*; *see also United States v. Muncy*, 526 F.2d 1261, 1264 (5th Cir. 1976) (citing *Ingram v. United States*, 360 U.S. 672, 678 (1959)).

The district court did not abuse its discretion in excluding evidence of Duran and his co-conspirators' lack of knowledge of the registration requirement under § 951 because this Court's precedent makes clear that knowledge of the registration requirement is not an element of the offense under § 951. *Campa*, 529 F.3d at 999.

### 2. Evidence of State of Mind Exception to the Hearsay Rule Was Properly Excluded

Duran argues that the district court abused its discretion in excluding admissible hearsay evidence under the Federal Rule of Evidence 803(3) state of mind hearsay exception proffered by Duran to show that he did not intend to act as an agent of the Venezuelan government. Rule 803(3) provides that regardless of

26

whether the declarant is unavailable as a witness, the hearsay rule does not exclude:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed.

The Supreme Court held that out-of-court statements admitted into court to establish intent are admissible. *Mutual Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 295 (1892). "[T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind." *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980).

Duran argues that several hearsay statements should not have been excluded under Rule 803(3) because they tended to prove that Duran did not intend to act as an agent of the DISIP. The Government argues that the district court never reached the question of whether the contested testimony lay outside the permissible scope of Rule 803(3); rather, the court's rulings were based upon its finding that the testimony was irrelevant and excludable under Rule 401. That Duran told a United States customs agent that he was in the United States to meet with Antonini, while he was carrying newspaper articles related to the Antonini matter was properly excluded because it did not meet Rule 401's test for relevancy, while

27

statements concerning Venoco's future did not fall within the state of mind exception because they explain why Duran had a concerned state of mind.

Further, the final statement, that Duran told Maionica "I'm never bringing [Antonini] that money," was arguably relevant but not particularly probative. D.E. 409 at 4. While Duran argues that his statement was a clear expression of intent used to show Duran was not acting as an agent of the DISIP, the Government correctly argues that Duran's proclaimed intent to deprive Antonini of his $2 million bribe provides no insight as to whether Duran had, over the preceding four months, acted as Venezuela's agent. Additionally, the Government correctly argues that Duran's acknowledgment that the DISIP was going to entrust him with $2 million in cash strongly suggests that he was, in fact, Venezuela's trusted representative. The admissibility of Duran's statement that he did not intend to deliver the money to Antonini for the purpose of showing that Duran did not intend to act as an agent of the DISIP was a close call under Rule 803(3), and the exclusion of the statement, if error, was harmless.

### 3.     The Rule 404(b) Evidence Was Properly Admitted

Duran argues that the district court abused its discretion by admitting evidence of Duran and Kauffmann's payment of illegal kickbacks to various Venezuelan government officials to establish his motive and intent to commit the

charged crimes under Federal Rule of Evidence 404(b), as well as to counter his belated claim of entrapment by showing predisposition to commit the crimes.

Under Rule 404(b), evidence of uncharged criminal conduct is admissible only if relevant to an issue other than the defendant's character or propensity to commit a crime. *See United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc). Rule 404(b) allows for the introduction of evidence of an extrinsic act if the Government "can demonstrate: (1) a proper purpose for introducing the evidence; (2) that the prior act occurred and that the defendant was the actor; and (3) that the probative value of introducing the evidence outweighs any prejudicial effect the evidence might have." *United States v. Cancelliere*, 69 F.3d 1116, 1124 (11th Cir. 1995) (citing *United States v. Perez-Garcia*, 904 F.2d 1534, 1544 (11th Cir. 1990)). Duran contends that the evidence of giving kickbacks to the Venezuelan government and various officials was not properly offered to show intent or motive, but merely as improper propensity evidence, as reflected in the prosecutor's closing argument, in which he referred to Duran's "life of crime." D.E. 422 at 109–10.

The evidence of Duran's kickbacks was properly admitted by the district court under Rule 404(b). First, the Government provided a proper purpose for introducing the evidence because Kauffmann's testimony showed similar criminal

acts by Duran that went to Duran's intent and motive to knowingly act as an agent

of the DISIP.  Second, Kauffmann's testimony stated that Duran paid kickbacks to

various Venezuelan government officials. *See United States v. Dickerson*, 248

F.3d 1036, 1047 (11th Cir. 2001) (citing *United States v. Bowe*, 221 F.3d 1183,

1192 (11th Cir. 2000)) (finding that uncorroborated testimony provided sufficient

basis for concluding that the defendant committed extrinsic acts).[11]  Third, the

danger of unfair prejudice to Duran was minimal because the Government showed

that the introduction of the kickbacks was probative to establish the relationship

between Duran and the Venezuelan government, and the court instructed the jury

regarding the proper purpose of such evidence. *See United States v. Baker*, 432

F.3d 1189, 1205 (11th Cir. 2005) (quoting *United States v. Meester*, 762 F.2d 867,

875 (11th Cir. 1985)) (stating that effectiveness of a limiting instruction should be

part of the court's analysis in determining admissibility under Rule 404(b)); D.E.

348 at 85–86.

    In addition to being admitted under Rule 404(b) for a proper purpose, the

kickback evidence was properly admitted in order for the Government to rebut

Duran's entrapment defense by establishing Duran's predisposition to act as an

agent of a foreign government without first notifying the Attorney General.

---

[11]Duran does not dispute that he gave such kickbacks, only that such evidence should be excluded.

Entrapment requires "government inducement of the crime and a lack of predisposition by the defendant to commit the crime." *United States v. Ventura*, 936 F.2d 1228, 1230 (11th Cir. 1991) (citing *Mathews v. United States*, 485 U.S. 58, 63 (1988)). After the defendant raises the defense of entrapment, the burden shifts to the Government to show that the defendant was predisposed to commit the offense charged beyond a reasonable doubt. *Id.* (citation omitted). According to Duran, the kickback evidence was not sufficiently similar to the violation of § 951 or the conspiracy to violate § 951 because Duran's previous transactions with the Venezuelan government were not with the DISIP or connected to this case. However, because similar acts used to demonstrate predisposition are offered precisely to show propensity, they are more broadly applicable, and their use is not subject to the normal constraints of evidence admitted pursuant to Rule 404(b). *See United States v. Burkley*, 591 F.2d 903, 922 (D.C. Cir. 1978); *United States v. Dickens*, 524 F.2d 441, 444 (5th Cir. 1975) (citations omitted).

Essentially, because the defendant puts his character at issue by raising an entrapment defense, he cannot complain that the Government introduces evidence as to such character. *Sorrells v. United States*, 287 U.S. 435, 451 (1932). Finally, the Government argued that Duran's previous dealings with the Venezuelan government were based upon his agreement to "kick back" profits to influential

31

officials. Similarly, Duran's anticipated benefits in this case were dependent upon his willingness to extort or bribe Antonini into remaining silent in order to receive favors from the DISIP or Venezuelan government in the future.

The district court did not abuse its discretion in admitting the Government's Rule 404(b) evidence of Duran's payment of kickbacks to various Venezuelan government officials because it showed Duran's intent, motive, and predisposition to knowingly act as an agent of a foreign government.

## C. Any Prosecutorial Misconduct Was Harmless

Duran alleges that the Government engaged in prosecutorial misconduct during his closing argument by improperly commenting on the Rule 404(b) evidence, with statements that Duran "spent the last ten years of his life bribing . . . officials" and that Duran had been involved in a "life of crime." D.E. 422 at 82, 109–10. We review allegations of prosecutorial misconduct *de novo* because it is a mixed question of law and fact. *Eckhardt*, 466 F.3d at 947. In analyzing allegations of prosecutorial misconduct, we must assess whether the challenged comments were improper, and if so, whether they affected the substantial rights of the defendant. *Campa*, 529 F.3d at 997 (quoting *United States v. Castro*, 89 F.3d 1443, 1450 (11th Cir. 1996)). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome

32

of the trial would have been different." *Eckhardt*, 466 F.3d at 947 (citing *United States v. Wilson*, 149 F.3d 1298, 1301 (11th Cir. 1998)). "When the record contains sufficient independent evidence of guilt, any error is harmless." *Id.* (citing *United States v. Adams*, 74 F.3d 1093, 1097–98 (11th Cir. 1996)).

Although the Government's comments could be construed by the jury as an effort to characterize the challenged remarks as improper propensity evidence, there was more than enough other evidence of guilt beyond a reasonable doubt for the jury to convict Duran of violating §§ 951 and 371. Because the district court properly instructed the jury as to the purpose for which Rule 404(b) evidence was introduced, we find that the prosecutor's comments did not prejudicially affect Duran's substantial rights at his trial, and therefore, any error was harmless.

## III. CONCLUSION

We affirm the convictions of Duran under 18 U.S.C. §§ 371 and 951. Section 951 is not unconstitutionally vague as applied to Duran. The district court did not abuse its discretion by by excluding evidence of Duran's lack of knowledge of the notification requirement under § 951, by excluding Duran's hearsay statements, or by admitting the Rule 404(b) evidence of Duran's kickbacks to various officials of the Venezuelan government. Finally, although the Government arguably engaged in prosecutorial misconduct during closing statements, such

33

error was harmless.  We therefore affirm Duran's convictions as to all counts.


**AFFIRMED.**

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

34